**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BRIAN WYBENGA,

     Plaintiff,                                      Case No.

v.                                                                Hon.

FORD MOTOR COMPANY,

     Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com
Grant@hurwitzlaw.com

---

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the complaint.

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiff Brian Wybenga ("Plaintiff"), by and through his attorneys,

HURWITZ LAW PLLC, brings this action against Defendant Ford Motor Company

("Defendant"), and hereby alleges as follows:

## **INTRODUCTION**

1.      This is an action arising from Defendant's decades-long scheme to misclassify Plaintiff as an independent contractor and supplier to extract full-time, exclusive labor from him, consistently exceeding 40 hours per week, while deliberately avoiding the obligation to pay overtime, provide employee benefits, or extend any of the protections of the employment relationship.  For more than 25 years, Defendant enjoyed the full benefit of Plaintiff's talent, institutional knowledge, and daily labor, while engineering a classification structure designed from the outset to deny him the wages and benefits the law required.  Despite functioning in every material respect as Defendant's employee—reporting daily to Defendant's World Headquarters, working exclusively for Defendant, using Defendant's provided equipment, holding a Ford email address, handling confidential materials for Defendant, and performing work integral to Defendant's Communications department—Defendant deliberately classified Plaintiff as a contractor and later compelled him to operate as an individual LLC solely to insulate itself from legal liability.  Defendant imposed this structure not because Plaintiff operated an independent business, but because Defendant recognized its legal exposure and sought to close the very loopholes that Plaintiff's situation created. Throughout Plaintiff's tenure, Defendant created formal employee positions for younger workers performing nearly identical or substantially similar duties to his

own.   Defendant refused, year after year, to extend that same status to Plaintiff despite his repeated requests.   When Defendant eventually assigned a significantly younger worker to perform the same duties as Plaintiff, it hired her as an employee, elevated her to manage Plaintiff, and then used that management relationship to systematically marginalize, undermine, and ultimately terminate him.   Plaintiff was terminated on or about January 30, 2025, at the age of 58, without notice, without severance, and without any of the retirement benefits he had been denied throughout his tenure.   Plaintiff brings this action to recover unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; the employee benefits wrongfully denied him under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*; damages for age discrimination under the Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101, et seq.; and restitution for the out-of-pocket costs Defendant's misclassification scheme forced him to bear.

### PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff is an individual residing in Detroit, Wayne County, Michigan.

3.      Defendant Ford Motor Company is a for-profit company with its principal place of business located in Dearborn, Wayne County, Michigan, and doing business throughout the Eastern District of Michigan.

3

4. This Court has subject matter jurisdiction over Plaintiff's claims under the FLSA and ERISA pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's claim under ELCRA and for unjust enrichment pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts as the federal claims.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as this is the district where Defendant regularly conducts business and where the events giving rise to Plaintiff's claims occurred.

## FACTUAL ALLEGATIONS

8. Defendant is a multinational automobile manufacturer with its principal place of business in Dearborn, Michigan.

9. At all times relevant, Defendant has been, and continues to be, an employer engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203.

10. Prior to working for Defendant, Plaintiff worked in the commercial photography business in Grand Rapids, Michigan, specializing in advertising photography.

11. In 1999, Plaintiff relocated to the Detroit area.

12. Through a professional contact, Plaintiff was put in touch with Dan Murray, the manager of Defendant's in-house photography department.

13.     In or about October 1999, Plaintiff began working for Defendant as a freelance photo assistant on a per-project basis.

14.     Plaintiff's initial work involved assisting photographers with lighting around vehicles and stage-managing photo shoots.

15.     Within three months of starting, Mr. Murry told Plaintiff that Defendant wanted him to "stick around" and come in every single day.

16.     Mr. Murray told Plaintiff that the photographers loved working with him and that Defendant did not want to risk losing him.

17.     From that point forward, Plaintiff's worked at Defendant's World Headquarters in Dearborn on a full-time, daily basis.

18.     Plaintiff was paid a flat daily rate for his work and submitted paper timesheets co-signed by his Ford manager.

19.     Plaintiff regularly worked more than 40 hours per week from the very beginning of his tenure.  Overtime was nominally available for weekend and holiday work during this early period, but Defendant's compensation structure was designed to compensate Plaintiff at flat rates regardless of the volume of hours worked during the regular workweek, effectively suppressing his overtime compensation from the outset.

20.     In or about 2003, Mr. Murray transitioned from his freelance role into a formal employee position in Defendant's Communications department.

21.     Upon becoming an employee, Mr. Murray created a new role at Defendant for Plaintiff titled "Image Coordinator."

22.     As Image Coordinator, Plaintiff researched and tracked images for Defendant's photo library and archives, worked with Defendant's communications and media teams to locate specific assets, and served as a link between Defendant and various automotive companies as Defendant transitioned to digital photography.

23.     Plaintiff's daily rate increased to approximately $340 per day in this role.

24.     Defendant's decision to create the Image Coordinator role by and for Plaintiff, rather than hire him as an employee to fill it, was consistent with Defendant's practice throughout Plaintiff's tenure: when Defendant needed a new function performed, it assigned that work to Plaintiff and expanded his responsibilities, but refused to extend to him the employee status, compensation protections, and benefits that the role warranted and that the law required.

25.     In or about 2006 and 2007, Plaintiff's role expanded further when he was brought into Defendant's Communications department as a "Photo Producer."

26.     In this capacity, Plaintiff booked photography shoots on behalf of Defendant, worked directly with creative teams, managed budgets, produced photography for vehicle reveals and press events, and liaised with vendors and

6

creative agencies. This role reflected a significant expansion of Plaintiff's responsibilities and his integration into Defendant's core communications function.

27. Throughout this period, Plaintiff worked directly alongside Defendant's employees who were performing comparable duties and receiving the full benefits of employment, including health insurance, retirement contributions, paid vacation, sick leave, and bereavement leave.

28. Plaintiff performed the same work, held the same responsibilities, and in many cases possessed greater institutional knowledge and skill than his employee counterparts, yet he received none of those benefits.

29. Defendant never offered Plaintiff employee status, and when he raised the issue, managers acknowledged the difficulty of creating a unique position for him requiring VP-level approval, which was purportedly a process Defendant was unwilling to pursue on his behalf despite doing so for others.

30. Defendant's managers controlled all aspects of Plaintiff's work throughout his tenure. They directed the manner and means of his job performance, provided creative briefs and style guides, required approval of all work product, funded projects from departmental budgets, and assigned Plaintiff new duties and expanded roles unilaterally.

7

31.     Plaintiff regularly worked with Defendant's personnel at the Vice President and Director levels, who provided direct guidance on the execution of his assignments.

32.     Defendant provided Plaintiff with all instrumentalities of his work, including an issued laptop, monitor, stand, mouse, hard drives, camera bodies, lenses, a camera bag, tripod, and additional photographic and production equipment.

33.     Defendant also provided Plaintiff with a dedicated desk, telephone, corporate credit card, and multiple office spaces over the years at Defendant's World Headquarters, in addition to a Ford email address.

34.     Plaintiff handled Defendant's confidential and proprietary materials on a regular basis.

35.     Plaintiff worked exclusively for Defendant throughout his tenure. Although he was never formally prohibited from accepting outside work, the demands of his daily, full-time engagement— combined with the understanding that he was expected to be present every working day—made other employment a practical impossibility.

36.     For multiple years, Plaintiff was unable to take any vacation whatsoever.

37.     Despite his full-time, exclusive engagement, Defendant never withheld Social Security taxes from Plaintiff's compensation and never provided him with a

W-2 form, further reflecting the deliberate legal fiction Defendant maintained to deny Plaintiff his rights under federal and state law.

38.    In or about 2006, Defendant initiated a company-wide effort to restructure its relationships with more than 100 freelance workers who were performing work directly for Defendant.

39.    Upon information and belief, one or more individuals had sued or threatened to sue Defendant for misclassification, and the restructuring was Defendant's response to that legal exposure.

40.    Defendant held an open house at which it presented five or six agency partners.  Freelance workers were invited to meet with those agencies, transition into agency employment, and then be sourced back to Defendant from the agency. Approximately half of the freelance workers accepted agency employment at that time.

41.    Plaintiff, who was working on a full-time daily basis and had achieved a compensation rate that would be reduced by agency overhead costs, did not transition to agency employment.

42.    Near the deadline for the restructuring, Plaintiff was informed of an alternative: he could continue working directly for Defendant if he formed a limited liability company and procured comprehensive commercial insurance at his own expense.

43.     These insurance requirements were designed for large vendor companies, not individuals. Defendant imposed them on Plaintiff knowing they were inappropriate for an individual worker in his position, and knowing that the primary effect and purpose was to further insulate Defendant from liability while retaining Plaintiff's daily, full-time labor.

44.     Plaintiff complied.   He formed a limited liability company and purchased commercial insurance at an annual cost of approximately $6,000.

45.     Over the course of more than 20 years as a "supplier," Plaintiff spent between $70,000 and $80,000 in insurance premiums and operating costs solely to satisfy Defendant's misclassification requirements and continue working.  Plaintiff was, in effect, paying out of his own pocket for the privilege of functioning as Defendant's employee without the legal protections that status required.

46.     Following the 2006 restructuring, Plaintiff's compensation structure changed in a manner that further harmed him: his flat daily rates, which had nominally included overtime availability for weekend work, were replaced by hourly billing at straight time for all hours worked, with no overtime premium regardless of the number of hours worked in a week.

47.     Plaintiff continued to work in excess of 40 hours per workweek throughout the remainder of his tenure, consistently performing overtime work for which he was never compensated at the rate the law required.

48.     After the restructuring, Defendant administered Plaintiff's compensation through MSX International, a third-party supplier management company, and later through Magnit Global, which assumed that function.

49.     Despite the intermediary payment structure, the substance of Plaintiff's relationship with Defendant remained entirely unchanged.  Defendant directed his work, provided his equipment, determined his rates, required his daily attendance, and retained the exclusive right to terminate his engagement.

50.     MSX and Magnit Global served merely as administrative conduits for Defendant's compensation of Plaintiff, and Defendant remained his true employer at all times.

51.     Throughout Plaintiff's tenure, Defendant repeatedly created formal employee positions for younger workers to perform duties that Plaintiff had developed, performed, or trained others to perform while refusing to extend that same status to Plaintiff despite his consistent requests.

52.     When Dan Murray transitioned from a freelance role into a formal Defendant employee position in 2003, he created the Image Coordinator role and assigned it to Plaintiff as an extension of his ongoing engagement without offering Plaintiff the employee classification that Mr. Murray himself had just obtained.

11

53. Over the years, Defendant hired multiple employees in the Communications department to perform work related to or overlapping with Plaintiff's responsibilities.

54. Plaintiff trained and worked alongside these employees, often possessed greater institutional knowledge and more extensive experience than they did, and was never offered the employee status they received.

55. In the period immediately preceding Plaintiff's termination, Defendant created a new employee position for a younger worker named April to assist with and absorb portions of Plaintiff's workload—a role that would not have existed but for Plaintiff's decades of work developing the function.

56. Defendant created an employee position out of Plaintiff's labor for a younger worker while continuing to deny Plaintiff that same status.

57. Plaintiff made repeated, sustained efforts throughout his tenure to be hired as an employee or, alternatively, to be transitioned into employment with one of Defendant's creative agency partners. Each request was deflected.

58. Defendant's managers acknowledged the institutional difficulty of creating a unique VP-approved position for Plaintiff but declined to pursue that process on his behalf.

59.     No formal hiring process was ever initiated for Plaintiff, and no agency employment option was ever made genuinely available to him, despite Defendant's demonstrated willingness to create and fill those positions for younger workers.

60.     In or about the period surrounding the COVID-19 pandemic, Plaintiff's long-time manager Karl Henkel's responsibilities shifted.

61.     During this transition, a younger employee named Tanya Moutzalias was brought in to assist with the production workload of photography and video projects within the Communications department.

62.     Plaintiff personally helped bring Ms. Moutzalias up to speed on the projects, workflows, and institutional knowledge she needed to perform her role.

63.     Plaintiff and Ms. Moutzalias worked side by side, performing substantially the same duties in support of Defendant's communications and photography production function.

64.     The critical distinction between Plaintiff and Ms. Moutzalias was not the nature or quality of their work, it was their classification.

65.     Defendant hired Ms. Moutzalias as an employee from the outset.  She received a salary, health insurance, retirement benefits, paid time off, and all other employment benefits to which Defendant's employees were entitled.  Plaintiff, performing the same work, received none of those things.

66. Defendant continued to refuse Plaintiff employee status even as it hired Ms. Moutzalias to perform the same duties beside him.

67. As Ms. Moutzalias became more embedded in the role that Plaintiff had developed and performed for years, Defendant elevated her: Mr. Henkel informed Plaintiff that because Plaintiff was working more closely with Ms. Moutzalias than with Mr. Henkel, Defendant would make Ms. Moutzalias Plaintiff's direct manager.

68. Defendant created a formal management position for Ms. Moutzalias, "Content and Creative Lead," that was built substantially on the foundation of Plaintiff's work and institutional knowledge.

69. A woman in her 30s, who Plaintiff had helped train, was now supervising a 59-year-old man with more than two decades of institutional knowledge that she did not possess.

70. Ms. Moutzalias's management approach toward Plaintiff was markedly different from that of his prior managers.

71. From the outset of her supervisory role, she was hostile, micromanaging, and controlling.

72. Ms. Moutzalias stripped Plaintiff of responsibilities he had held for years. She absorbed his duties. She excluded him from communications directly relevant to his role. She communicated poorly, inconsistently, and in a manner that

14

consistently placed Plaintiff in positions where he appeared to be failing, whether or not the underlying failure was his.

73.     Plaintiff experienced her management as a series of situations engineered to create grounds for criticism and reprimand that bore no relationship to the quality of his work.

74.     Plaintiff's prior managers, with whom he had worked productively for years, had not managed him in this manner.

75.     The abrupt shift in treatment coincided directly with Ms. Moutzalias's elevation to a supervisory role over Plaintiff and reflected, in Plaintiff's reasonable assessment, the discomfort and insecurity of a younger manager threatened by the superior experience, institutional knowledge, and professional standing of an older subordinate.

76.     The working environment under Ms. Moutzalias's management became untenable.  Plaintiff experienced significant depression and anxiety as a direct result of her treatment.  He went from being a well-regarded, relied-upon member of Defendant's communications team—an ambassador who worked comfortably with executives at the VP and Director level—to feeling systematically set up to fail by a manager who had taken over a role she lacked the experience to have developed independently.

77. In the days immediately preceding Plaintiff's termination, Ms. Moutzalias excluded Plaintiff from critical communications regarding a high-profile photography event in North Carolina involving Defendant's Executive Chairman Bill Ford.

78. Managing events of this nature, including coordinating photographers, routing images for executive approval, and interfacing with the offices of senior leadership, was squarely within Plaintiff's established area of responsibility and had been for years.

79. Plaintiff attended a planning call for the North Carolina event the day before his termination.

80. Plaintiff had to leave the call approximately ten minutes early to pick up his children from school, having already covered all agenda items.

81. Ms. Moutzalias and the client had not communicated to Plaintiff, either during or after that call, that Bill Ford would be in attendance and that Plaintiff would be designated as the point of contact for routing the resulting images.

82. The following day, Ms. Moutzalias sent Plaintiff an email copying contacts within Bill Ford's office and identifying Plaintiff as the point of contact for Bill Ford's image routing. This was the first Plaintiff had heard of Bill Ford's involvement.

83. Ms. Moutzalias's communication effectively placed Plaintiff on notice of a responsibility he could not fulfill, as he had a prior conflict that evening and could not be available.

84. Plaintiff responded to Ms. Moutzalias privately, noting that this was the first he was hearing of Bill Ford's involvement, flagging the communication breakdown, and advising that he had a conflict and could not be available that night.

85. Rather than acknowledge the communication failure, Ms. Moutzalias ignored Plaintiff's concern, arranged for another party to cover the assignment, and then responded to Plaintiff in a manner that attributed the failure to him and characterized him as deficient in the execution of his responsibilities.

86. Plaintiff responded that if Ms. Moutzalias intended to blame him for her own failure to communicate, he was "done."

87. Plaintiff's statement reflected his exhaustion with a pattern of treatment that had persisted for years, not a voluntary resignation.

88. Following that exchange, Plaintiff received no communication from Ms. Moutzalias or any other representative of Defendant.

89. Recognizing the need to create a formal record of Ms. Moutzalias's conduct, Plaintiff contacted Defendant's Human Resources department to inquire about filing a complaint.

90.     Defendant's HR representative discouraged Plaintiff from filing a formal report and instructed him instead to "report up" through his management chain—the very individuals who would execute his termination within days.

91.     Plaintiff's subsequent attempts to reach Mr. Henkel by text and telephone were met with complete silence.

92.     A meeting was scheduled for Friday, January 31, 2025, titled "Regroup," ostensibly to include Plaintiff, Ms. Moutzalias, and Mr. Henkel.

93.     Plaintiff prepared notes and documentation addressing the management issues he intended to raise.

94.     The meeting was not a regroup.  It was a termination call, conducted through Defendant's supplier management intermediary.

95.     Ms. Moutzalias opened the call, offered a brief statement of thanks, stated that it was obvious Plaintiff was not happy, and informed him that Defendant was ending his engagement.

96.     When Plaintiff attempted to address the management issues and his pending HR complaint, Ms. Moutzalias stated she had to go and disconnected.

97.     Plaintiff's Ford email was deactivated immediately following the call. All Ford-provided equipment, including his laptop, monitor, cameras, lenses, hard drives, and other gear, was retrieved.

98. Plaintiff received no advance notice of termination, no severance, and no transition period.

99. Plaintiff was ineligible for unemployment benefits because Defendant had classified him as a supplier rather than an employee. Plaintiff had accrued no retirement benefits from Defendant despite 25 years of daily, full-time service.

100. The termination—without notice, without severance, without any recognition of 25 years of labor, and without any genuine opportunity to address his pending HR complaint—caused Plaintiff significant financial hardship and emotional distress.

101. Plaintiff has been unable to find comparable employment since his termination

## COUNT I
## VIOLATION OF THE FAIR LABOR STANDARDS ACT

101. Plaintiff realleges and incorporates by reference all preceding allegations.

102. At all times relevant to this Complaint, Plaintiff was Defendant's "employee" within the meaning of the FLSA, 29 U.S.C. § 203(e).

103. Plaintiff was economically dependent upon Defendant in all material respects: he worked exclusively for Defendant, used tools and equipment provided by Defendant, performed work integral to Defendant's regular business operations, was subject to Defendant's direction and control in the execution of his work, and

19

had no opportunity for independent profit or loss apart from his fixed compensation from Defendant, and maintained a continuous working relationship with Defendant lasting more than 25 years.

104. At all times relevant to this Complaint, Defendant was Plaintiff's employer within the meaning of the FLSA, 29 U.S.C. § 203(D), and was engaged in interstate commerce within the meaning of the Act.

105. Plaintiff regularly and consistently worked in excess of 40 hours per workweek throughout his tenure with Defendant.

106. For the three-year period preceding the filing of this Complaint, Plaintiff worked in excess of 40 hours per workweek and was compensated at a straight-time rate for all hours in violation of 29 U.S.C. § 207(a)(1).

107. Defendant's violations of the FSLA were willful.

108. Defendant was aware of its obligations under the FLSA and took deliberate steps to avoid those obligations.

109. As a direct and proximate result of Defendant's willful violations of the FLSA, Plaintiff has been deprived of overtime compensation in amounts to be determined at trial.

110. Plaintiff is entitled to recover all unpaid overtime wages, liquidated damages, pre- and post-judgment interest, and attorneys' fees and costs.

**COUNT II**

20

## VIOLATION OF THE EMPLOYMENT RETIREMENT INCOME SECURITY ACT—DENIAL OF EMPLOYEE BENEFITS

111. Plaintiff realleges and incorporates by reference all preceding allegations.

112. At all times relevant to this Complaint, Defendant maintained employee benefits plans within the meaning of ERISA, 29 U.S.C. § 1002(1) and (2), including retirement plans, health insurance plans, and other welfare benefit plans made available to Defendant's direct employees (the "Plans").

113. Plaintiff was Defendant's "employee" within the meaning of ERISA, 29 U.S.C. § 1002(6).

114. Defendant controlled the manner and means of Plaintiff's work.

115. Defendant provided all instrumentalities and tools necessary to perform Plaintiff's work.

116. Plaintiff performed work that was integral to Defendant's regular business operations.

117. The parties maintained an exclusive working relationship for more than 25 years.

118. Defendant retained the unilateral right to terminate the engagement.

119. Plaintiff had no opportunity for independent profit or loss.

120. Plaintiff maintained no independent business apart from his work for Defendant.

21

121.    As an employee of Defendant, Plaintiff was a "participant" within the meaning of ERISA, 29 U.S.C. § 1002(7)—an employee who was eligible, and who should have been permitted, to participate in the Plans made available to Defendant's direct employees.

122.    Defendant wrongfully excluded Plaintiff from participation in its employee benefit plans by misclassifying him as an independent contractor and, later, as a supplier.  That classification was a deliberate legal fiction.  Defendant excluded Plaintiff from plans that covered its employees—including younger workers performing the same or similar duties alongside Plaintiff—despite Plaintiff's status as a common-law employee entitled to those benefits.

123.    As a direct result of Defendant's misclassification, Plaintiff was denied health insurance, retirement and 401(k) contributions, paid vacation, paid sick leave, bereavement leave, parental leave, and severance throughout his 25-year tenure.

124.    When Plaintiff's parents passed away, he received no bereavement leave.

125.    When his children were born, he received no parental leave.

126.    For multiple years, Plaintiff was unable to take any vacation at all.

127.    As a further direct and proximate result of Defendant's misclassification, Plaintiff was forced to expend between $70,000-$80,000 in commercial insurance premiums over more than 20 years, costs that were imposed

22

upon him solely as a condition of Defendant's misclassification scheme and that he would not have incurred but for Defendant's unlawful conduct.

128.   Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff brings this action as a participant to recover the value of benefits due to him under the terms of the Plans, to enforce his rights under the terms of the Plans, and to clarify his rights to future benefits under the Plans.  Had Plaintiff been properly classified as an employee, he would have been eligible for and entitled to participate in the Plans on the same terms as Defendant's other employees throughout his tenure.  The monetary value of the retirement contributions, health insurance coverage, paid leave, and other welfare benefits wrongfully withheld from Plaintiff over more than 25 years represents benefits "due to him under the terms of the plan" within the meaning of § 1132(a)(1)(B), and Plaintiff is entitled to recover their full value under that provision.

129.   Separately and independently, Plaintiff seeks equitable relief under § 1132(a)(3) for categories of harm that fall outside the scope of § 1132(a)(1)(B), including: (a) Reformation of Plaintiff's benefits status to reflect his true classification as a common law employee of Defendant.  Defendant's deliberate misclassification scheme wrongfully prevented Plaintiff from ever being enrolled in the Plans despite his entitlement to participate as an employee.  Reformation is an equitable remedy hat corrects the consequences of that wrongful exclusion, restores

Plaintiff to the enrollment status he was entitled to, and ensures that the full value of benefits due under the Plans is recoverable; (b) Surcharge for the full make-whole value of Plaintiff's wrongful exclusion from the Plans, including all losses attributable to Defendant's deliberate conduct in preventing Plaintiff's enrollment and participation. Surcharge is an equitable remedy that restores to Plaintiff the value of what Defendant's wrongful scheme caused him to lose; and (c) Restitution of the $70,000 to $80,000 in commercial insurance premiums and LLC operating costs that Defendant's misclassification scheme forced Plaintiff to bear as a condition of continued engagement.

## COUNT III
## AGE DISCRIMINATION IN VIOLATION OF MICHIGAN'S ELCRA

130. Plaintiff realleges and incorporates by reference all preceding allegations.

131. At all times relevant to this Complaint, Plaintiff was an employee of Defendant within the meaning of the ELCRA, MCL § 37.2201, for the same reasons set forth in Counts I and II.

132. Plaintiff was 58 years old at the time of his termination and is a member of a protected class.

24

133.   Plaintiff was qualified for his position, as established by 25 years of continuous, full-time service, expanding responsibilities, and consistent recognition by Defendant's management.

134.   Defendant discriminated against Plaintiff on the basis of his age in violation of MCL § 37.2202 by subjecting him to materially adverse treatment in the terms and conditions of his engagement.

135.   Defendant hired Tanya Moutzalias, a substantially younger employee, to perform the same duties Plaintiff had performed for years, classified her as an employee and extended to her the benefits of that status while continuing to deny Plaintiff the same classification, and then elevated to her to serve as Plaintiff's direct manager.   Defendant effectively replaced Plaintiff with a younger employee, gave that employee supervisor authority over him, and then used that supervisory relationship to marginalize and ultimately terminate him.

136.   Ms. Moutzalias, once elevated to manage Plaintiff, engaged in a sustained pattern of hostile, undermining, and discriminatory conduct directed at Plaintiff because of his age, including, *inter alia*: (a) stripping Plaintiff of responsibilities he had held for years and absorbing them herself; (b) excluding Plaintiff from communications critical to his role; (c) managing him in a manner designed to create the appearance of performance failures rather than to support his success; (d) treating Plaintiff's superior experience and institutional knowledge not

as assets but as threats; and (e) using her supervisory position to systematically erode his standing within the organization.

137.   Defendant created a new employee position for a younger worker, April, to absorb Plaintiff's duties in the period immediately before his termination, while denying a position for Plaintiff for 25 years.

138.   Defendant's repeated refusal to hire Plaintiff as an employee while hiring younger workers into employee positions performing substantially similar duties reflects a discriminatory pattern of denying older workers the advancement and protections extended to younger counterparts.

139.   As a direct and proximate result of Defendant's violations of the ELCRA, Plaintiff has suffered lost wages, lost benefits, emotional distress, humiliation, damage to professional reputation, and diminished earning capacity.

140.   Plaintiff is entitled to lost wages, lost benefits, emotional distress damages, harm to reputation, loss of earning capacity, liquidated damages, punitive damages, from pay, interest, attorneys' fees and costs, and any other remedies available at law or in equity.

**COUNT IV**
**UNJUST ENRICHMENT / RESTITUTION**

141.   Plaintiff realleges and incorporates by reference all preceding allegations.

26

142. As set forth above, Defendant required Plaintiff to form a limited liability company and produce and maintain comprehensive commercial insurance as a condition of continuing his engagement. These requirements were designed for large vendor companies, not individual workers, and were imposed on Plaintiff solely to perpetuate Defendant's misclassification scheme and insulate Defendant from legal liability.

143. Plaintiff complied with these requirements and, over the course of more than 20 years, expended between $70,000 and $80,000 in insurance premiums and LLC operating expenses solely to satisfy Defendant's supplier classification demands. These costs were not incurred in the operation of independent business; they were incurred as the direct price of Defendant's deliberate legal fiction, paid out of Plaintiff's own pockets so that Defendant could retain his daily, full-time labor without assuming the legal obligations of an employer.

144. Defendant received the direct benefit of Plaintiff's labor throughout this period while successfully avoiding the costs and obligations of an employment relationship, including overtime wages, benefits contributions, and payroll taxes. Defendant's retention of those benefits without restitution to Plaintiff for the costs it imposed upon him is inequitable and unjust.

145. Plaintiff is entitled to restitution of all amounts expended in connection with Defendant's supplier classification requirements, in an amount to be proven at

27

trial but estimated at between $70,000 and $80,000, together with pre- and post-judgment interest.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendant as follows:

a.     An award of all unpaid overtime compensation under the FLSA for the three-year period preceding the filing of this Complaint, together with liquidated damages in an equal amount pursuant to 29 U.S.C. § 216(b);

b.     An award of all employee benefits wrongfully withheld under ERISA, including the value of retirement, pension, and health insurance benefits denied throughout Plaintiff's tenure, together with equitable relief, including reformation of Plaintiff's enrollment status to reflect his true classification as a common law employee, surcharge for the full make-whole value of Plaintiff's wrongful exclusion from the Plans, and restitution for all insurance costs Defendant's misclassification scheme imposed upon Plaintiff;

c.     Compensatory damages for lost wages, lost benefits, emotional distress, damage to professional reputation, and loss of earning capacity arising from Defendant's violations of the ELCRA;

d.     Punitive damages under the ELCRA for Defendant's intentional and malicious discriminatory conduct;

e.     Restitution of all amounts Plaintiff was forced to expend as a result of Defendant's misclassification scheme, in an amount between $70,000 and $80,000;

f.     Pre- and post-judgment interest on all amounts awarded;

g.     Attorneys' fees and costs as permitted by the FLSA, ERISA, and ELCRA; and

h.     Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
*Attorneys for Plaintiff*
340 Beakes St. Ste. 125
Ann Arbor, MI 48104
noah@hurwitzlaw.com

Dated: March 20, 2026                 grant@hurwitzlaw.com

29

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BRIAN WYBENGA,

     Plaintiff,               Case No.

v.                         Hon.

FORD MOTOR COMPANY,

     Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com
Grant@hurwitzlaw.com

---

## **DEMAND FOR TRIAL BY JURY**

NOW COMES Plaintiff Brian Wybenga, by and through his attorneys, HURWITZ LAW PLLC, and hereby demands a jury trial in the above-captioned matter for all issues so triable.

                        Respectfully Submitted,

                        HURWITZ LAW PLLC

                        */s/ Noah S. Hurwitz*
                        Noah S. Hurwitz (P74063)
                        Grant M. Vlahopoulos (P85633)

*Attorneys for Plaintiff*
340 Beakes St. Ste. 125
Ann Arbor, MI 48104
noah@hurwitzlaw.com
grant@hurwitzlaw.com

Dated: March 20, 2026

2